UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

<table>
<tr><td>RAMON CORTESLUNA,</td><td>Case No.17-cv-05133-JSC</td></tr>
<tr><td>Plaintiff,</td><td></td></tr>
<tr><td>v.</td><td>**ORDER RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**</td></tr>
<tr><td>MANUEL LEON, et al.,</td><td>Re: Dkt. No. 47</td></tr>
<tr><td>Defendants.</td><td></td></tr>
</table>

Plaintiff Ramon Cortesluna brings this civil rights action against the City of Union City and three Union City Police Officers alleging violation of state and federal law in connection with an incident at his home on November 6, 2016. Defendants' motion for summary judgment is now pending before the Court.[1] (Dkt. No. 47.) Having considered the parties' briefs and having had the benefit of oral argument on December 20, 2018, the Court GRANTS Defendants' motion for summary judgment on the federal claims and dismisses the state law claims pursuant to *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966).

**SUMMARY JUDGMENT EVIDENCE**

**A. Undisputed Facts**

On November 6, 2016, 12-year old Isabelle Ramos called 911 to report that she, her mother, and her 15-year old sister were in a room at 34877 Starling Drive and she was worried

---

[1] All parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c). (Dkt. Nos. 4, 14.)

that their mother's boyfriend, Ramon Cortesluna, was going to hurt them.[2]  (Dkt. No. 41-1 (Ex. A, 911 audio); Dkt. No. 41-1 (Ex. B, Dispatch audio).[3])  Dispatch requested a unit to respond to ascertain the problem and advised that the reporting party, a 12-year-old girl, was crying saying that her mom's boyfriend was trying to hurt them and that he had a chainsaw.  (Dkt. No. 41-1, Ex. B.)  Dispatch advised that the reporting party was in a room with her mom and 15-year-old sister and that the mom was holding the door so the boyfriend would not open it.  (*Id.*)  Dispatch reported that there had been another crying hang-up 911 call in the area that might be related. (*Id.*)  The reporting party advised that the boyfriend was "using a chainsaw to break something in the house" and the dispatcher reported that the 911 operator stated that she could hear sawing in the background, but that it had stopped. (*Id.*)  The reporting party stated that the boyfriend was always drinking.  (*Id.*)

City of Union City Police Officers Leon, Rivas-Villegas, and Bellotti heard the broadcast as did Lieutenant Graetz and Sergeant Kensic.   (Dkt. No. 41-2 (Leon Depo.) at 26:13-27:4; Dkt. No. 41-3 (Rivas-Villegas Depo.[4]) at 18:13-15, 21:14-20; Dkt. No. 41-4 (Bellotti Depo.) at 13:19-14:15); Dkt. No. 41-5 (Graetz Depo) at 20:2-4; Dkt. No. 41-6 (Kensic Depo.) at 22:18-21, 24:4-14.)  They all responded to the scene. (Dkt. No. 41-2 (Leon Depo.) at 32:1-6; Dkt. No. 41-3 (Rivas-Villegas Depo) at 18:18:18-19; Dkt. No. 41-4 (Bellotti Depo.) at 16:11-16; Dkt. No. 41-5 (Graetz Depo) at 20:5-17; Dkt. No. 41-6 (Kensic Depo.) at 24:21-25:12.)  Lieutenant Graetz, Officer Bellotti, and Officer Rivas-Villegas all arrived at the same time (Dkt. No. 41-3 (Rivas-Villegas Depo) at 18:24-19:1.)

Lieutenant Graetz asked dispatch if the reporting party and her family could exit the house

---

[2] Isabelle Ramos identifies the individual as Ramon Cortez.  Because there is no dispute that the individual Isabel was referring to is the plaintiff Ramon Cortesluna, the Court refers to him by the name under which he filed this action.

[3] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

[4] The cover page for Exhibit D states that it is the August 13, 2018 deposition of Manuel David Leon and this same header appears at the top of each page of the exhibit.  However, the Allen Declaration, to which Exhibit D is attached, states that Exhibit D is the deposition of Daniel Rivas-Villegas and in fact the substance of the transcript reflects that it the deposition of Daniel Rivas-Villegas notwithstanding the heading to the contrary.

and dispatch responded that they "were unable to get out" and that the 911 "call taker could hear sawing in the background, sounds like the male is trying to saw the door down." (Dkt. No. 41-1, Ex. B.) Dispatch confirmed that they were in a bedroom in the rear of the house. (*Id.*) Dispatch reported they were trying to confirm whether it was a chainsaw or a normal manual saw. (*Id.*) Dispatch advised that the reporting party told the call taker that it was a chainsaw, but that the call taker could not hear it and "he might be using it manually on the door." (*Id.*) Officer Rivas-Villegas asked Dispatch if the caller was using a landline or cell phone because he was concerned that it was a "swatting call." (Dkt. No. 39.) Dispatch confirmed that it was a cell phone. (Dkt. No. 41-1, Ex. B.) Dispatch advised that the only people in the house were the reporting party, her sister, her mother, and the boyfriend. (*Id.*) Dispatch provided the following description of the boyfriend: Ramon Cortseluna, Hispanic, 5'7", with a skinny build, wearing red sweatpants. (*Id.*) Dispatch also noted that Mr. Cortesluna was "1026" and "clear in AFS."[5] (Dkt. No. 54-4.)

Around this same time, one of the officers can be heard on Officer Rivas-Villegas's body camera saying that he had visual on a man in red sweatpants with a beer in his hand—later to be identified as Mr. Cortesluna. (Dkt. No. 39; Dkt. No. 48.) Officer Rivas-Villegas confirmed with other officers that they could not hear any sounds coming from the residence. (*Id.*) Another officer can be heard on the on the body camera stating that the man in the sweatpants was walking back to the rear of the residence. (*Id.*) The officers then made a plan to enter the residence. (*Id.*) The officers confirmed they had "less-lethal"—a "less-lethal shotgun." (*Id.*) They decided to all approach the front of the residence together and give the suspect verbal commands to come out. (*Id.*) At the time they decided this, they had visual of Mr. Cortesluna drinking a beer in the kitchen. (*Id.*) The four officers approached the front door and Officer Rivas-Villegas knocked loudly stating "police department, come to the front door, Union City police, come to the front door." (*Id.*) Another officer shouted, "he's coming and has a weapon" at which point one officer stated, "use less-lethal."[6] (*Id.*) Officer Rivas-Villegas ordered Mr. Cortesluna to "drop it"

---

[5] Plaintiff states this means he was free of warrants.

[6] The "weapon" was later identified as a metal tool. (Dkt. No. 55-1 (Cortesluna Depo.) at 31:18-24.) It is undisputed that Mr. Cortesluna put it down when ordered prior to exiting the residence.

multiple times, which he did. (*Id*.) Officer Rivas-Villegas then ordered him to "come out, put your hands up, walk out towards me." (*Id*.) Officer Rivas-Villegas ordered him a second time to "walk towards me," and as Mr. Cortesluna did so Officer Rivas-Villegas said, "keep coming" and then "stop, get on your knees." (*Id*.) As Officer Rivas-Villegas was giving this latter order, Sergeant Kensic shouted "he has a knife in his left pocket, knife in his pocket." (*Id*.) Sergeant Kensic shouted "don't, don't put your hands down" and "hands up." (*Id*.) As Sergeant Kensic shouted this last order, Mr. Cortesluna turned his head toward him, and simultaneously lowered his head and hands. (*Id*.) Officer Leon then shot Mr. Cortesluna once with less lethal and nearly immediately thereafter a second time with the less-lethal. (*Id*.) Officer Leon hit Mr. Cortesluna in the lower stomach and then in the left hip. (Dkt. No. 41-2 (Leon Depo.) at 61:4-19.)

Following the shooting, the officers all shouted for Mr. Cortesluna to "get down" which he did. (Dkt. No. 39; Dkt. No. 48.) Mr. Cortesluna was moaning and crying in pain. (*Id*.) Sergeant Kensic shouted "stay there ma'am, stay inside, go back in the room." (*Id*.) Sergeant Kensic also stated "left pocket, he's got a knife." (*Id*.) Officer Rivas-Villegas ordered Officer Bellotti to "get the house" and Sergeant Kensic stated that "there is a female to the left inside." (*Id*.) Officer Rivas-Villegas then held Mr. Cortesluna down while Officer Leon handcuffed him. (Dkt. No. 41-3 (Rivas-Villegas Depo) at 53:6-19.)

### B. Individual Accounts of the Incident

#### 1. Mr. Cortesluna

Mr. Cortesluna was on his way back to his bedroom, which he had locked himself out of earlier in the day, when he heard the police knocking at his door. (Dkt. No. 53 (Cortesluna Decl.) at ¶¶ 4, 6.) He used one hand to open the sliding door and in the other hand he had a metal tool (a chisel bit). (*Id*. at ¶ 6; Dkt. No. 55-1 (Cortesluna Depo.) at 31:14-19.) When the officers told him to drop it, he did, and then he stepped outside with his hands up. (Dkt. No. 55-1 at 31:22-25.) He heard officers tell him to put his "hands up" but "I kind of put down, because I was hearing something on the left side. And that's when they shot at me." (*Id*. at 36:10-13.) He lowered his

---

(Dkt. No. 41-3 (Rivas-Villegas Depo.) at 40:21-24.)

hands because he was "confused by all the orders and the shouting from the police." (Dkt. No. 53 at ¶ 6.) English is not his first language. (*Id*.) He was 10-11 feet from the officers when he was shot. (*Id*. at ¶ 7.) After the first shot to his lower belly/groin, he turned to the left and his hands went to the area of impact and then he was hit again in his right hip. (*Id*. at ¶ 8.) As he was following orders to get to the ground, he felt someone put their foot and weight on his back. (*Id*. at ¶ 9.) It was very painful and then he was handcuffed and lifted by his handcuffed arms, which was also very painful. (*Id*.)

### 2. Officer Leon

Once he got to the scene, Officer Leon armed himself with the less-lethal shotgun and went to meet with Lieutenant Graetz. (Dkt. No. 41-2 (Leon Depo.) at 32:21-23.) Officer Leon shot his less-lethal shotgun after Sergeant Kensic said "don't put your hands down" because he "believed the subject was preparing to arm himself, he was going for a weapon." (*Id*. at 57:5-20.) At that point Mr. Cortesluna was seven to ten feet from Officer Leon and Officer Rivas-Villegas. (*Id*. at 57:21-22, 58:4-8.) Officer Leon felt that Mr. Cortesluna was a risk to himself and the other officers because he was close enough to engage with the officers if he armed himself and he could reenter the residence. (*Id*. at 58:9-22.) Officer Leon did not feel it was feasible to warn Mr. Cortesluna before he shot him because "it was immediate and [Mr. Cortesluna's] response to Sergeant Kensic's instructions w[as] the opposite." (*Id*. at 60-5-15.) Officer Leon fired a second shot "[b]ecause he was still posing a threat. His hands were still in the vicinity of the knife, and he was turned away from me, so, I couldn't see what he was doing." (*Id*. at 61:1-10.)

### 3. Officer Rivas-Villegas

Officer Rivas-Villegas observed Mr. Cortesluna with a heavy rod in his left hand when he came to the sliding door. (Dkt. No. 41-3 (Rivas-Villegas Depo.) at 37:4-12.) He believed that Mr. Cortesluna was confronting them "[be]cause he came up to talk to [them] with that rod in his hand." (*Id*. at 38:15-20.) Mr. Cortesluna never made any verbal threats and complied with the order to put the rod down. (*Id*. at 40:15-24.) Mr. Cortesluna complied with all of Officer Rivas-Villegas's subsequent orders but did not comply with Sergeant Kensic's order not to put his hands down. (*Id*. at 44:2-6.) Instead, Mr. Cortesluna "put his hands down and started reaching for the

knife." (*Id*. at 44:5-9.)  After Plaintiff was shot, Officer Rivas-Villegas ordered him to the ground, but he did not do so quickly and Officer Rivas-Villegas "didn't know if he was formulating a plan in his head to grab for the knife or run back inside the house" so he "pushed him down to the ground. In order to stop him from escaping." (*Id.* at 52:17-23.)  Officer Rivas-Villegas then "got over him so [he] could grab his hands to prevent him from arming himself." (*Id*. at 53:6-8.)  He used his foot to push him down and his knee to hold him there.  (*Id*. at 56:9-15.)  Officer Leon then handcuffed Mr. Cortesluna while Officer Rivas-Villegas "maintained" his hands.  (*Id*. at 53:15-19.)  Officer Rivas-Villegas then lifted Mr. Cortesluna by the handcuffs because he "needed to quickly get him out of the doorway" since the house still had not been cleared.  (*Id*. at 57:1-11.)

## PROCEDURAL BACKGROUND

Plaintiff filed this action in September 2017, a little less than a year after the incident, against Officer Rivas-Villegas, Officer Leon, Sergeant Kensic, and the City of Union City ("the City").  (Dkt. No. 1.)  He alleged nine claims: (1) violation of his Fourth Amendment rights under 42 U.S.C. § 1983 as to Officers Rivas-Villegas and Leon; (2) municipal liability under 42 U.S.C. § 1983 as to the City; (3) negligence; (4) assault and battery; (5) intentional infliction of emotional distress; (6) violation of California's Civil Rights Action, Cal. Civ. Code §§ 51, 51.7, 52.1(a), (b); (7) negligent infliction of emotional distress; (8) respondeat superior liability as to the City; and (9) negligent hiring, training, and supervision as to the City.  (Dk. No. 1.)   Before the Defendants answered, Plaintiff filed a First Amended Complaint omitting his negligent infliction of emotional distress and respondeat superior claims.  (Dkt. No. 9.)  Defendants thereafter appeared and answered the First Amended Complaint.  (Dkt. No. 15.)

Defendants filed the now pending motion for summary judgment on November 15, 2018.  (Dkt. No. 47.)  The motion is fully briefed and came before the Court for a hearing on December 20, 2018.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a). The Court must draw "all reasonable inferences [and] resolve all factual conflicts in favor of

the non-moving party." *Murphy v. Schneider Nat'l, Inc.*, 362 F.3d 1133, 1138 (9th Cir. 2004). A fact is material if it "might affect the outcome of the suit under the governing law," and an issue is genuine if "a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There can be "no genuine issue as to any material fact" when the moving party shows "a complete failure of proof concerning an essential element of the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

When the party moving for summary judgment does not bear the burden of proof at trial (usually the defendant), the party has the burden of producing evidence negating an essential element of each claim on which it seeks judgment or showing that the opposing party cannot produce evidence sufficient to satisfy her burden of proof at trial. *Nissan Fire & Mar. Ins. Co., Ltd. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Once the moving party meets that burden, the non-moving party must show that a material factual dispute exists. *California v. Campbell*, 138 F.3d 772, 780 (9th Cir. 1998). When the party moving for summary judgment would bear the burden of proof at trial (usually the plaintiff), "it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *C.A.R. Transp. Brokerage Co., Inc. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal quotation marks and citation omitted). "In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case. Once the moving party comes forward with sufficient evidence, the burden then moves to the opposing party, who must present significant probative evidence tending to support its claim or defense." *Id.* (internal quotation marks and citation omitted).

## EVIDENTIARY OBJECTIONS

Defendants have raised a number of evidentiary objections regarding the evidence Plaintiff has submitted in opposition to Defendants' motion for summary judgment, and Plaintiff has raised objections to Defendants' reply evidence. Because the disputed evidence is not material to the Court's decision, it is unnecessary to resolve these objections.

## DISCUSSION

Defendants move for summary judgment on each of Plaintiff's claims, but a threshold

question is whether the officers' actions constituted excessive force, and if so, whether the officers are entitled to qualified immunity.

**I. Section 1983 Claims against the Officers**

"Section 1983 does not create any substantive rights, but is instead a vehicle by which plaintiffs can bring federal constitutional and statutory challenges to actions by state and local officials." *Anderson v. Warner*, 451 F.3d 1063, 1067 (9th Cir. 2006). To prevail on a Section 1983 claim, Plaintiff must show that the alleged conduct both occurred "under color of state law" and deprived Plaintiff of a constitutional or federal statutory right. *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 887 (9th Cir. 2003). There is no dispute that Officer Rivas-Villegas, Officer Leon, Sergeant Kensic were acting under color of law; thus, the only question is whether they are entitled to summary judgment because there is no dispute of material fact as to the use of force, or, even if there is, whether they are entitled to qualified immunity. Plaintiff's excessive force claim against each defendant is predicated on a different basis. The excessive force claim as to Officer Leon is based on his use of the less-lethal shotgun. His excessive force claim against Officer Rivas-Villegas is based on the handcuffing and moving of Plaintiff once handcuffed. Finally, his claim against Sergeant Kensic is based on a failure to intervene theory.

**A. Fourth Amendment-Excessive Force Claim as to Officer Leon**

Whether a defendant's use of force was "reasonable" under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake." *Graham v. Connor*, 490 U.S. 386, 395 (1989). Thus, the question is "whether the officers' actions [were] 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. In making that determination, courts consider "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley v. Hendrickson*, 135 S Ct. 2466, 2472 (2015) (citing *Graham*, 490 U.S. at 296). The *Kingsley* factors are not exclusive; instead, courts

should consider all of the circumstances it deems relevant. *See Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010)

"The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. This determination is normally a question for the jury because it requires "resolution of disputed questions of fact and determinations of credibility, as well as on the drawing of inferences." *Santos v. Gates*, 287 F.3d 846, 852 (9th Cir. 2002) ("[E]xcessive force claims typically boil down to an evaluation of the various accounts of the same events. Thus, the circumstances surrounding those events may be critical to a jury's determination of where the truth lie."). Summary judgment may be appropriate, however, when the facts concerning an incident are largely undisputed. *See Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994) ("[D]efendants can still win on summary judgment if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances.").

Defendants contend that Officer Leon's use of the less-lethal beanbag shotgun was reasonable as a matter of law given the totality of the undisputed circumstances: the officers were responding to a request to investigate a 911 call from a minor that reported that she, her 15-year old sister, and mother were locked in a room, the mother's intoxicated boyfriend was trying to hurt them and he had a chainsaw, and when Plaintiff approached the officers he was observed with a knife in his pocket and despite an order to raise his hands, he lowered his hands toward the area of the knife. Plaintiff for, his part, contends that a reasonable jury could conclude that the use of force was unreasonable because he was confused by the officers' contradictory orders, English is not his first language, he was generally compliant with the officers' orders, he was not aware that he had a knife, he was not reaching for the knife, and he was given no warning before he was shot.

### 1. Nature and Quality of the Intrusion

The first step is to "assess the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted." *Glenn v. Washington Cty.*, 673 F.3d 864, 871 (9th Cir. 2011) (internal citation and quotation marks omitted). Here,

Officer Leon used a beanbag shotgun which is "a twelve-gauge shotgun loaded with ... 'beanbag' round[s]," which consist of "lead shot contained in a cloth sack." *Deorle v. Rutherford*, 272 F.3d 1272, 1277 (9th Cir. 2001). "It is intended to induce compliance by causing sudden, debilitating, localized pain, similar to a hard punch or baton strike. Although bean bag guns are not designed to cause serious injury or death, a bean bag gun is considered a 'less-lethal' weapon, as opposed to a non-lethal weapon, because the bean bags can cause serious injury or death if they hit a relatively sensitive area of the body, such as [the] eyes, throat, temple or groin." *Glenn*, 673 F.3d at 871 (internal quotations marks omitted; alterations in original). "In light of this weapon's dangerous capabilities, [s]uch force, though less than deadly, ... is permissible only when a strong governmental interest compels the employment of such force." *Id*. at 872 (internal citation and quotation marks omitted).

### 2. Government's Interest at Stake

#### *a) Severity of the Crime*

"The character of the offense is often an important consideration in determining whether the use of force was justified." *Deorle v. Rutherford*, 272 F.3d 1272, 1280 (9th Cir. 2001).

Here, officers responded to a dispatch telling the officers there was a 911 call from a minor saying that she, her sister, and mother were locked in a bedroom, her mother was holding the door, and her mother's intoxicated boyfriend was trying hurt them and perhaps saw the door open with a chainsaw. Three crimes were thus alleged: California Penal Code § 236 (false imprisonment), California Penal Code 245(a)(1) (assault with a deadly weapon), and California Penal Code 273a (child endangerment). Plaintiff does not address whether these are the appropriate crimes for Plaintiff's alleged conduct; instead, he insists that the whole thing was a misunderstanding based on a "misperception the part of the teens." (Dkt. No. 52 at 23:3.) However, the severity of the crime is judged from the perspective of the officer at the time of the incident—not with the benefit of hindsight. *See Graham*, 490 U.S. at 396. The officers understood they were responding to a domestic violence call and "[w]hen officers respond to a domestic abuse call, they understand that violence may be lurking and explode with little warning. Indeed, more officers are killed or injured on domestic violence calls than on any other type of call"; thus, "[w]e take very seriously

10

the danger that domestic disputes pose to law enforcement officers, and we have no trouble concluding that a reasonable officer arriving at the [] residence reasonably could be concerned about his or her safety." *Mattos v. Agarano*, 661 F.3d 433, 450 (9th Cir. 2011) (internal citations and quotation marks omitted). A reasonable officer responding to a domestic violence call under the undisputed circumstances present here would have had a heightened concern about the safety of himself and fellow officers as well as the safety of the woman and minors inside the residence.

### b) Immediacy of the Threat to the Officers or Others

"The most important factor under *Graham* is whether the suspect posed an immediate threat to the safety of the officers or others." *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010). In weighing this factor, "judges should be cautious about second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation. With the benefit of hindsight and calm deliberation, the panel majority concluded that it was unreasonable for petitioners to fear that violence was imminent" but the reasonableness must be judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Ryburn v. Huff*, 565 U.S. 469, 477 (2012). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Graham*, 490 U.S. at 396-97. "[A]an officer's use of force must be objectively reasonable based on his contemporaneous knowledge of the facts." *Deorle*, 272 F.3d at 1281.

Defendants contend that a reasonable officer in their position would have perceived Plaintiff as a threat because (1) they were responding to a domestic violence call of an intoxicated suspect with a chainsaw and with a woman and minors locking themselves in a bedroom trying to stay away from the suspect, (2) Plaintiff had a knife in his left pocket, (3) in response to a command to put his hands up he instead lowered his hands toward the area of the knife, (4) at the time this occurred he was in close proximity of the officers, and (5) Plaintiff thus could have engaged the officers who were 10-11 feet away if he had armed himself. Plaintiff insists that drawing all inferences in his favor, it was not reasonable for Officer Leon to conclude that he posed an immediate threat either to the residents of the house or the officers. In particular,

Plaintiff notes that on the home security video it is apparent that he was not reaching for the knife, he was lowering his hands to the front of his thighs, his fingers were out and not curled toward the knife, he lowered both hands at the same time slowly and steadily, which is not consistent with someone reaching for a knife, and the knife was blade up in his pocket at the time.

A reasonable trier of fact could not find that many of these facts alleged by Plaintiff would have been known by Officer Leon; namely, what exactly Plaintiff's hands were doing, that he was not reaching for the knife, and that the knife blade was facing up. The video establishes that it was dark and that the knife was on the opposite side of Plaintiff's body away from Officer Leon. And Officer Leon testified that he could not see the knife, he heard Sergeant Kensic yell that Plaintiff had a knife and command Plaintiff not to put his hands down, and that Plaintiff instead started lowering his hands. (Dkt. No. 41-2 (Leon Depo.) at 57:5-20.) Plaintiff does not identify any evidence that supports a reasonable inference that Officer Leon knew that Plaintiff was not going for his knife. Thus, a reasonable trier of fact would have to find that Officer Leon reasonably believed that Plaintiff posed a threat to the officers when he moved his hand toward his knife as opposed to away as ordered, especially given that the officers were responding to a domestic violence call.

*c) Actively Resisting or Evading Arrest*

There is no dispute that Plaintiff complied with all the officers' orders until the order to put his hands up when Sergeant Kensic saw the knife. Plaintiff had previously come to the door, dropped the chisel when ordered by officers, exited the home with his hands up, and stopped moving toward the officers when ordered. Nor is there a dispute that when Plaintiff was ordered to raise his hands, he did the opposite. Plaintiff explains, however, that this was because he was confused by the order because Officer Rivas-Villegas was also giving him other orders to get on his knees and English is not his first language and further that active resistance cannot be based simply on a failure to follow orders. *See Nelson v. City of Davis*, 685 F.3d 867, 882 (9th Cir. 2012) ("active resistance is not to be found simply because of a failure to comply with the full extent of an officer's orders" and noting that use of intermediate force is not "where an individual's resistance was [not] particularly bellicose"). Here, however, under the undisputed

12

facts, Plaintiff's resistance was not his failure to comply with orders, but his act of doing the *opposite* and moving his hands in the direction of a weapon. That he did not do so intentionally is not material as there was no way for a reasonable officer to know whether Plaintiff intentionally or accidentally moved his hands down when told to put them up; all a reasonable officer would know is that he moved his hand toward the knife.

#### d) The Absence of a Warning

The absence of a warning is also considered when weighing the reasonableness of the use of force. Officers should "provide warnings, where feasible, even when the force used is less than deadly." *Deorle*, 272 F.3d at 1284 (collecting cases re: same). Warnings are not required whenever less than deadly force is employed, but where feasible they should be given and "the giving of a warning or the failure to do so is a factor to be considered in applying the *Graham* balancing test." *Id*. It is undisputed that Officer Leon did not give a warning prior to shooting Plaintiff with the less-lethal shotgun; however, only seconds elapsed between Sergeant Kensic noting that there was a knife, the order to put his hands up, and Plaintiff lowering his hands. Further, as five officers had guns "pointed at [Plaintiff] when he was instructed [to raise his hands]; the consequences of a failure to comply with the command should have been clear." *Hill v. Bay Area Rapid Transit Dist.*, No. C-12-00372 DMR, 2013 WL 5272957, at *6 (N.D. Cal. Sept. 18, 2013) (collecting cases re: non-verbal warnings). Under the undisputed facts, a reasonable trier of fact could not conclude that there was time for a warning as an officer in Officer Leon's position would have perceived an imminent threat to his safety and that of his fellow officers and the residents in the home.

#### e) Availability of Alternative Means

"Officers need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct we identify as reasonable. However, police are required to consider [w]hat other tactics if any were available, and if there were clear, reasonable and less intrusive alternatives to the force employed, that militate[s] against finding [the] use of force reasonable." *Glenn*, 673 F.3d at 876 (internal citation and quotation marks omitted; alterations in original). Plaintiff argues that officers should have considered using

13

Spanish commands or repositioning themselves to a safe distance once they observed the knife. However, Plaintiff had responded to the first set of commands when given in English, and Plaintiff does not identify any evidence that would support an inference that the officers had reason to believe he did not understand English. As for Plaintiff's repositioning argument, it is undisputed that the officers were in an enclosed patio with Plaintiff with their backs to the wall at the time of the incident. If Officer Leon believed that Plaintiff was going for the knife when he lowered his hands, there was no time for the officers to reposition.

### 3. Balancing the Interests

To determine whether Officer Leon's use of the less-lethal shotgun was objectively reasonable as a matter of law, the Court must determine "whether the degree of force used was warranted by the governmental interests at stake." *Deorle*, 272 F.3d at 1282. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *See Wilkinson v. Torres*, 610 F.3d 546, 550 (9th Cir. 2010) (quoting *Graham*, 490 U.S. at 396-97).

While the facts underlying the incident are generally not in dispute, Plaintiff contends that drawing the following inferences in his favor a reasonable jury could conclude that the use of force was not objectively reasonable:

- the 911 call might not have been credible given that the Officers observed Plaintiff calmly in the kitchen and the officers themselves questioned the credibility of the call given the statement that they were concerned about swatting;
- Plaintiff appeared calm;
- Plaintiff complied with all orders up until the order from Sergeant Kensic that he put his hands up;
- Plaintiff was confused by the conflicting orders;
- Sergeant Kensic's order included a double negative: "Don't don't put your hands down";
- English is not Plaintiff's first language;
- no warning was given before Plaintiff was shot;
- Plaintiff was lowering his hands, but not *reaching* for the knife that he was unaware was in his pocket;

14

- Plaintiff's failure to raise his hands following the first shot was a result of his involuntary reaction—holding the injury area.

The Court disagrees. Plaintiff's inferences are almost all based on hindsight and not what facts were known to Officer Leon at the time he deployed the less-lethal shotgun. Officer Leon did not know that English was not Plaintiff's first language or that Plaintiff was confused by the orders.[7] Officer Leon knew that he was responding to a domestic violence call of an intoxicated man with a chainsaw threatening to hurt a woman and two minors, that one of his fellow officers saw a knife in the suspect's pocket when he and his fellow officers were within 10-11 feet of the suspect with their back to a wall, and that when the suspect was given an order to put his hands up he did the opposite lowering his hands in the direction of the knife. Under these circumstances, a reasonable officer in Officer Leon's shoes would have concluded that there was an imminent threat to his safety and that of his fellow officers. A use of intermediate, less-lethal force under these circumstances was objectively reasonable. *Smith*, 394 F.3d at 704. Likewise, that Officer Leon deployed a second less-lethal shotgun blast less than a second after the first when Plaintiff still failed to raise his hands was not objectively unreasonable: the knife was on the opposite side of Plaintiff's body from Officer Leon and thus he could not have perceived during the second between deployments that Plaintiff was reaching for his stomach and not the knife. Thus, the deployment of the second shotgun blast was likewise objectively reasonable.

### B. Officer Leon is Entitled to Qualified Immunity

Even if the Court were to conclude a reasonable jury could find that Officer Leon's use of force was not objectively reasonable, Officer Leon would nonetheless be entitled to qualified immunity. Individual officers are protected "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "In determining whether an officer is entitled to qualified

---

[7] Plaintiff's argument that Sergeant Kensic's use of a double negative—"Don't don't put your hands down"—made the order doubly confusing is specious as among other things it ignores that Sergeant Kensic's undisputed final command before less-lethal was deployed was "hands up." Further, a requirement that officers cannot use force unless their commands are delivered in perfect grammar in volatile situations is neither supported by the law or common sense.

immunity, we consider (1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct." *Lal v. California*, 746 F.3d 1112, 1116 (9th Cir. 2014).

"[C]learly established law [is not to be defined] at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). Instead, in deciding whether a constitutional right was clearly established at the time of the alleged violation, a court must ask "whether the violative nature of *particular conduct* is clearly established." *Id.* (emphasis added). "The plaintiff bears the burden to show that the contours of the right were clearly established." *Clairmont v. Sound Mental Health*, 632 F.3d 1091, 1109 (9th Cir. 2011). "This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled on other grounds by Pearson*, 555 U.S. at 236. "Although this Court's caselaw does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018). Qualified "immunity protects all but the plainly incompetent or those who knowingly violate the law." *Id.*

"[S]pecificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix v. Luna*, 577 U.S. ——, ——, 136 S.Ct. 305, 308 (2015) (internal quotation marks omitted). "Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *Kisela*, 138 S. Ct. at 1153 (internal citation and quotation marks omitted). In making this determination, courts consider the state of the law at the time of the alleged violation and the information that the official possessed to determine whether a reasonable official in a particular factual situation should have been on notice that his or her conduct was illegal. *Inouye v. Kemna*, 504 F.3d 705, 712 (9th Cir. 2007).

The question here then is whether at the time of this incident in November 2016 the law was clearly established that officers could not use non-lethal force under the circumstances after

16

drawing all reasonable inferences in Plaintiff's favor:

- officers respond to a 911 call that two minors and their mother have locked themselves in a bedroom because the mother's intoxicated boyfriend is trying to hurt them and has a chainsaw,

- officers are told the reporting minor is crying, that the mother is holding the door, and that the 911 employee can hear what sounds like a chainsaw,

- officers confront Plaintiff who complies with orders, but when one officer observes a knife in Plaintiff's pocket and orders him to put his hands up, Plaintiff instead lowers his hands in the direction of the knife and the officer and his fellow officers are in a confined space 10-11 feet away from Plaintiff.

Plaintiff insists that "[i]t has long been established that a failure to comply fully or immediately with an officers' orders, especially where there is no immediate threat, neither rises to the level of active resistance nor justifies the application of force" and cites a string of cases in support of this position. (Dkt. No. 52 at 27:23-25.) There are two primary defects with Plaintiff's argument. First, it is based on the premise that there was no immediate threat and no active resistance, but as discussed above, the undisputed facts are that Plaintiff had a knife in his pocket and when ordered to put his hands up he, instead, lowered his hands toward the knife. "[W]here a suspect threatens an officer with a weapon such as a gun or a knife, the officer is justified in using deadly force." *Smith*, 394 F.3d at 704. Indeed, in *Smith*, on which Plaintiff relies, the Ninth Circuit contrasted the facts there—an unarmed individual who was pepper sprayed and attacked by a police canine when he disobeyed officers orders to turn around and put his hands on his head—with facts which would justify the use of deadly force such as where a suspect threatens an officer with a knife. *Id.* at 694, 704.

Second, none of the cases upon which Plaintiff relies—*Nelson v. City of Davis*, 685 F.3d 867, 879 (9th Cir. 2012); *Smith*, 394 F.3d 689; *Glenn v. Washington Cty.*, 673 F.3d 864, 871 (9th Cir. 2011); *Deorle v. Rutherford*, 272 F.3d 1272, 1279 (9th Cir. 2001); *Hesterberg v. United States*, 71 F. Supp. 3d 1018, 1032 (N.D. Cal. 2014)—are analogous let alone "existing precedent [that] 'squarely governs' the specific facts at issue." *Kisela*, 138 S. Ct. at 1153. In *Nelson*, the

17

Ninth Circuit held that "a reasonable officer would have been on notice that both the firing of a projectile that risked causing serious harm, in the direction of non-threatening individuals who had committed at most minor misdemeanors, and the release of pepper spray in the area occupied by those individuals, would constitute unreasonable force in violation of the Fourth Amendment." 685 F.3d at 886; *see also Hesterberg*, 71 F. Supp. 3d at 1036 (holding that it was objectively unreasonable for a park ranger to use a taser on "a fleeing, nonviolent, non-serious misdemeanant, who posed no threat to [the officer] or the public, who was not sufficiently warned prior to the tasing, and who [the officer] knew had an undefined heart condition"). Here, in contrast, the officers were responding to domestic violence call that reported the attempted use of lethal force on a mother and her children—not a minor misdemeanor or infraction—and Plaintiff lowered his hands towards a weapon—facts very different from *Nelson* and *Hesterberg*..

The Ninth Circuit's decision in *Glenn* likewise fails to establish that Officer Leon's use of less-lethal force violated clearly established law. In *Glenn*, officers fatally shot a suicidal and intoxicated man in his own driveway after he did not comply with orders to drop a pocketknife which he held to his own neck. 673 F.3d at 867-69. The officers shot him six times with a beanbag shotgun and then with their semiautomatic weapons. *Id.* at 869. The Ninth Circuit reversed the district court's grant of summary judgment in favor of the defendant police officers. *Glenn* is readily distinguishable from the facts here as the man there was "suicidal on the night in question and the threats of violence known to the responding officers focused on harming himself rather than other people," he did not threaten the officers, and only held the knife to his own neck. *Id.* at 873. Here, the undisputed facts are that officers had been told that Plaintiff had been using a chainsaw and was threatening to hurt a woman and two children who had locked themselves in a bedroom with the mother holding the door to keep the boyfriend out and when Plaintiff was told to put his hands up after the knife was spotted in his pocket, he lowered his hands in the direction of the knife; thus, in contrast to *Glenn* "there was [significant] reason to believe [Plaintiff] could have done [] immediate harm." *Id.* at 874.

In *Deorle*, an officer shot the plaintiff, an emotionally disturbed man, in the face with a beanbag shogun because he "was walking at a 'steady gait' in his direction" although the plaintiff

18

"was unarmed, had not attacked or even touched anyone, had generally obeyed the instructions given him by various police officers, and had not committed any serious offense." 272 F.3d at 1275. The Ninth Circuit reversed the district court's grant of summary judgment in the officer's favor, holding that such use of force was excessive and that the officer was not entitled to qualified immunity because "[e]very police officer should know that it is objectively unreasonable to shoot—even with lead shot wrapped in a cloth case—an unarmed man who: has committed no serious offense, is mentally or emotionally disturbed, has been given no warning of the imminent use of such a significant degree of force, poses no risk of flight, and presents no objectively reasonable threat to the safety of the officer or other individuals." *Id.* at 1285. While *Deorle* is arguably more analogous than the other cases upon which Plaintiff relies, the Supreme Court has twice cautioned courts in the Ninth Circuit from "read[ing] its decision in [*Deorle*] too broadly in deciding whether a new set of facts is governed by clearly established law." *Kisela*, 138 S. Ct. at 1154; *City & Cty. of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765, 1776 (2015) ("Whatever the merits of the decision in *Deorle*, the differences between that case and the case before us leap from the page.").

In contrast to the cases relied upon by Plaintiff, recent Ninth Circuit and Supreme Court case law compels the conclusion that Officer Leon is entitled to qualified immunity. In *S.B. v. Cty. of San Diego*, 864 F.3d 1010, 1011 (9th Cir. 2017), the Ninth Circuit held that officers were entitled to qualified immunity after they fatally shot a man with knives in his pocket. The officers were responding to a 911 call of an intoxicated and mentally unstable individual (Mr. Brown) who had "been acting aggressively." *Id.* When the officers encountered Mr. Brown in his home, he had knives in his pocket, ignored orders to put his hands up, and instead, reached for a knife at which point the officers opened fire. *Id.* at 1011-13. The Ninth Circuit held that *Glenn* was inapposite because there the decedent held the knife to his own neck, whereas Mr. Brown "grabb[ed] the knife from his pocket despite orders to place his hands on his head." *Id.* at 1016. The court also distinguished *Deorle* because in *Deorle* "that emotionally disturbed individual was unarmed at the time an officer shot him in the face with a beanbag gun." *Id.* at n.5. The Ninth Circuit concluded that the officers use of deadly force under the circumstances did not violate

19

clearly established law.

More recently, the Supreme Court in *Kisela* reversed the Ninth Circuit's denial of qualified immunity to an officer who shot a woman armed with a kitchen knife. *Kisela*, 138 S. Ct. at 1153. The officer was responding to a 911 call from a bystander that a woman—later identified as the plaintiff—had been acting erratically and "was seen hacking a tree with a large kitchen knife." *Id*. When the police arrived, they saw the plaintiff still armed with a kitchen knife walking towards another woman—later identified as her roommate. *Id*. at 1151. The officer was separated from the women by a locked chain-link fence. *Id*. The plaintiff appeared calm but ignored commands to drop the knife. *Id*. The officer opened fire, shooting her four times, and she sustained non-life threatening injuries. *Id*. at 1151. Less than a minute transpired between when the officer saw the plaintiff and when the shots were fired. *Id*.

Here, as in *Kisela*, the plaintiff had a knife and ignored the officer's commands. Further, unlike *Kisela*, the officers here were responding to a report of domestic violence with minors involved, and unlike *Kisela*, the plaintiff here did not just ignore the officer's commands—he did the *opposite*. Under these circumstances, *Kisela* requires the Court to conclude that Officer Leon is entitled to qualified immunity. To put it another way, the caselaw cited by Plaintiff does not place the constitutionally beyond debate." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018).

**C. Fourth Amendment-Excessive Force Claim as to Officer Rivas-Villegas**

Plaintiff alleges that Officer Rivas-Villegas violated his Fourth Amendment rights during the handcuffing and when he was moved via his handcuffs thereafter. In particular, Plaintiff attests that after he was shot and as he was ordered to the ground "someone put their foot and their weight on my back" and he "felt tremendous pain from that and then again while being lifted and moved by my arms handcuffed behind my back." (Dkt. No. 53, Cortesluna Decl. at ¶ 9; *see also* Dkt. No. 55-1, Cortesluna Depo. at 40:8-41:3.) Plaintiff contends that the knife was away from his body so there was no reason for this level of force citing to the security camera footage, but the Court's review of the footage establishes that it was not until the officers were in the process of handcuffing Plaintiff that one of the officers removed the knife from his pocket and tossed it away. (Dkt. No. 53 at Ex. 1 at 14:59.) Further, the entire incident—from the moment Officer Rivas-

Villegas secured Plaintiff until he was moved out of the way—lasted less than 30 seconds. (*Id.* at 14:46-15:11.)

Generally, handcuffing a suspect to effect an arrest is standard practice. *See Malek v. Green*, No. 17-CV-00263-BLF, 2017 WL 4284117, at *18 (N.D. Cal. Sept. 27, 2017) (collecting cases re: the same). In *Meredith v. Erath*, 342 F.3d 1057, 1061 (9th Cir. 2003), the Ninth Circuit held that a reasonable jury could conclude that it was excessive force where an officer investigating a non-violent tax invasion offence grabbed the plaintiff by the arms, forcibly threw her to the ground, and, handcuffed her while twisting her arms although she did not make any attempt to flee nor was she a safety risk. Here, in contrast, Officer Rivas-Villegas was attempting to secure an armed suspect after responding to a domestic violence call. While Plaintiff alleges that the handcuffing and movement were painful, he does not allege that Officer Rivas-Villegas twisted his arms or prolonged the handcuffing beyond that reasonably necessary to restrain him.[8] Nor does he allege that he was injured as a result of his handcuffing and movement. *Compare Crump v. Bay Area Rapid Transit Dist.*, No. 17-CV-02259-JCS, 2018 WL 4927114, at *12 (N.D. Cal. Oct. 10, 2018) (holding that plaintiff's claim that the handcuffing resulted in a torn rotator cuff presented a dispute of fact that precluded summary judgment on the excessive force claim but

---

[8] Plaintiff's reliance on caselaw regarding "abusive application of handcuffs," "overly tight handcuffing," and "lifting an individual by a handcuff" as "spiteful excessive force" is unpersuasive. Each of the cases Plaintiff relies upon involve factual scenarios far afield from that here. *See, e.g, Blankenhorn v. City of Orange*, 485 F.3d 463, 469 (9th Cir. 2007) (after the plaintiff refused to kneel to be handcuffed and used profanity, the officers tackled the plaintiff and struggled with him for several seconds during which time the plaintiff was punched in the head and body); *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1054 (9th Cir. 2003) (after calling an ambulance to take an unarmed, hallucinating individual to a medical facility on a 5150 hold, officers decided to take him into custody, and in doing so, one officer knocked him to the ground and handcuffed him while another officer put his weight on the plaintiff's back); *Palmer v. Sanderson*, 9 F.3d 1433, 1434–35 (9th Cir. 1993) (plaintiff was stopped on suspicion of driving while intoxicated and after he became tired of standing in the rain, he returned to his vehicle at which point the officer pulled him "out of his car, pushed him against it, frisked him, handcuffed him, and pushed him into the back seat of the patrol car with such force that [plaintiff] fell over sideways" and placed the handcuffs "tight enough to cause pain and discoloration to his wrists"); *Hansen v. Black*, 885 F.2d 642, 645 (9th Cir. 1989) (the plaintiff stated "that the handcuffs were put on in an abusive manner and that she was physically injured in the arrest"); *Wall v. Cty. of Orange*, 364 F.3d 1107, 1109 (9th Cir. 2004) (the plaintiff's hands were handcuffed "extremely tight" behind his back, the officer picked the plaintiff up by his handcuffed arms and threw him "upside down" and head first into the patrol car).

finding that the officers were entitled to qualified immunity); *with Wall v. Cty. of Orange*, 364

F.3d 1107, 1110 (9th Cir. 2004) (denying qualified immunity where the force used was excessive

under the circumstances and the plaintiff suffered nerve damage as a result of the handcuffing).

Plaintiff cites no authority for the proposition that under the facts here—where officers encounter

and need to effectuate an arrest on an armed suspect and secure a premise—the level of force used

was excessive.

Drawing all inferences in Plaintiff's favor, the Court concludes that a reasonable jury could

not conclude that the level of force used here was excessive. Even if this were not the case,

Officer Rivas-Villegas would be entitled to qualified immunity for any such use of force because

while the Ninth Circuit has held that overly-tight handcuffing can constitute a Fourth Amendment

violation, *see LaLonde v. County of Riverside*, 204 F.3d 947, 960 (9th Cir. 2000), Plaintiff's

complaint here is not about overly tight handcuffing, but rather, about the amount of pressure used

to restrain him and the fact that he was moved via his handcuffed hands, but Plaintiff has not

"identif[ied] a case where an officer acting under similar circumstances as [defendants] was held

to have violated the Fourth Amendment." *White v. Pauly*, 137 S. Ct. 548, 552 (2017).

**D. Fourth Amendment-Failure to Intervene as to Sergeant Kensic**

Officers may be held liable under Section 1983 when their fellow officers use excessive

force if they have an "opportunity to intercede" but fail to do so. *Cunningham v. Gates*, 229 F.3d

1271, 1289-90 (9th Cir. 2000), as amended (Oct. 31, 2000). Here, Plaintiff contends that Sergeant

Kensic, who was present, but did not use any force against Plaintiff is liable because he failed to

"intercede when Officer Leon announced, while Mr. Cortesluna was still in the house, that he was

going to 'hit him with less lethal,' did not interceded when Officer Leon did 'hit him with less

lethal,' not when Officer Leon and Rivas stomped and stood on Mr. Cortesluna and lifted him by

the handcuffs."[9] (Dkt. No. 52 at 15:15-18.) Plaintiff, however, has presented no evidence that

---

[9] Defendants construe Plaintiff's argument as including a claim based on a theory of supervisory
liability. A supervisor may be held liable under Section 1983 for "1) their own culpable action or
inaction in the training, supervision, or control of subordinates; 2) their acquiescence in the
constitutional deprivation of which a complaint is made; or 3) for conduct that showed a reckless
or callous indifference to the rights of others." *Edgerly v. City and County of San Francisco*, 599
F.3d 946, 961 (9th Cir. 2010) (internal quotations and citations omitted). However, as Defendants

Sergeant Kensic knew that Officer Leon was going to deploy less lethal—as opposed to knowing that he had less lethal—and the decision to deploy less lethal was a split section decision when Plaintiff lowered his hands towards the knife after being given the order to put his hands up. Under these circumstances, even drawing all inferences in Plaintiff's favor, Sergeant Kensic had no "realistic opportunity" to intercede under these circumstances. *See Cunningham*, 229 F.3d at 1290 (finding that the non-shooting officers who were present at the shootouts had no "realistic opportunity" to intercede and thus could not be liable for failing to intervene to prevent the shooting). Further, or more fundamentally, because the Court concludes that Officer Rivas-Villegas did not use excessive force in handcuffing and moving Plaintiff, Sergeant Kensic cannot be liable for failing to intervene to stop the handcuffing or movement.

***

Accordingly, the Court concludes that even if a reasonable jury could conclude that Officer Leon's use of the less-lethal shotgun here constituted excessive force, he is entitled to qualified immunity. Likewise, even if a reasonable jury could conclude that Officer Rivas-Villegas used excessive force in handcuffing Plaintiff and moving him—which the Court does not believe it could—he too would be entitled to qualified immunity for any such use of force. Finally, no reasonable jury could conclude that Sergeant Kensic had a realistic opportunity to intervene to stop the use of force here were a jury to conclude that the use of force here was unreasonable. Summary judgment will be granted in Officer Leon, Officer Rivas-Villegas, and Sergeant Kensic's favor on the Section 1983 claim.

**II. Section 1983 Claim against the City**

Because the Court grants summary judgment in the officers' favor on the Section 1983 claim, Plaintiff's *Monell* claim against the City is moot as it is predicated on a constitutional violation and this Court concludes that a reasonable trier of fact could not find one. *See Forrester v. City of San Diego*, 25 F.3d 804, 808 (9th Cir. 1994).

---

note, Plaintiff did not plead a claim for supervisory liability and cannot inject one now in opposing summary judgment. *See Trishan Air, Inc. v. Fed. Ins. Co*., 635 F.3d 422, 435 (9th Cir. 2011). Thus, to the extent that Plaintiff's claim as to Sergeant Kensic is predicated on a supervisory liability theory, the Court declines to consider it.

### III. State Law Claims

Because the Court grants summary judgment on the federal claims in Defendants' favor, the Court declines to exercise supplemental jurisdiction of the state law claims and instead dismisses them without prejudice. *See United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."). "[S]tate courts routinely handle assault, battery, and negligence claims against police officers, and the similarity between the analyses for these state law claims and federal claims does not mean that federal courts can or should exercise jurisdiction over these matters." *Martinez v. City & Cty. of San Francisco*, No. C-13-04197 DMR, 2014 WL 7387809, at *3 (N.D. Cal. Dec. 29, 2014) (also noting that many courts in this district have remanded or dismissed state court tort claims against officers when the federal claims have been resolved).

### CONCLUSION

For the reasons stated above, the Court GRANTS summary judgment in Defendants' favor on the federal claims and dismisses the state law claims without prejudice.

This Order disposes of Docket No. 47.

**IT IS SO ORDERED.**

Dated: December 21, 2018

_____
JACQUELINE SCOTT CORLEY
United States Magistrate Judge